Jo Ann COLLIGAN, by her mother and next friend, Josephine G. Colligan, and Valerie Shine, by her father and next friend, William Shine, on behalf of themselves and all those similarly situated, Plaintiffs-Appellants,

v.

ACTIVITIES CLUB OF NEW YORK, LTD., also known as New York Winter Ski Club, a corporation; Fred Krasny; Mrs. Albert; Peninsula Bus Company, Inc., a corporation; and B and C Bus Line, Inc., a corporation, Defendants-Appellees.

No. 100, Docket 34737.

United States Court of Appeals, Second Circuit.

Argued Oct. 8, 1970.

Decided May 6, 1971.

Jack Greenberg, New York City (Eric Schnapper, New York City, of counsel), for plaintiffs-appellants.

Sidney J. Leshin, New York City, for defendants-appellees.

Before MOORE, SMITH and ANDERSON, Circuit Judges.

MOORE, Circuit Judge:

This is an appeal from an order dismissing appellants' class action for money damages, an accounting for profits and an injunction brought under § 43(a) of the Lanham Act,[1] on the ground that their claim failed to state a cause of action. The district court ruled on its own motion that the suit could not be maintained, because, as consumers, as opposed to commercial plaintiffs, appellants lacked standing to sue under § 43(a). Without the benefit of any opposition on appeal to appellants' counsel's able brief, which sets forth the issues with beguiling simplicity, for the reasons stated below we nevertheless affirm.

## FACTS

The two appellants, parochial school children, by their parents and next friends, brought this suit on behalf of themselves and as members of two classes: (1) 153 students of the Sacred Heart Academy of Hempstead, New York, who allegedly were deceived and damaged by "defendants' use of false descriptions and representations of the nature, sponsorship, and licensing of their interstate ski tour service";[2] and (2) all high school students within the New York metropolitan area who are likely to be deceived and thereby injured by defendants' similarly deceptive practices in the future. The factual substance of the complaint is summarized below.

Appellants and their 151 classmates prepaid defendant Activities Club of New York, Inc. (the Club), $44.75 per person as the full price for a ski tour to Great Barrington, Massachusetts to be conducted during the weekend of January 24, 1970, in reliance upon the Club's representations that: each child would be provided with adequate ski equipment and qualified instruction; safe, reliable and properly certified transportation would be provided between New York and Great Barrington; and all meal costs would be included in the prepaid tour price.[3] These representations were conveyed by means of flyers, allegedly deceptively similar to those of National Ski Tours, a well known and reputable ski service, and by means of other written and oral communications.

The ski weekend began as represented but was cut short and proved otherwise

1. 15 U.S.C. § 1125(a).
   Section 43(a) provides as follows:
   "Any person who shall affix, apply or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by use of any such false description or representation."

2. Complaint at 4a.

3. Complaint at 5a.

unsatisfactory by the following developments, which for purposes of reviewing the dismissal of a complaint we assume to be true: only 88 pairs of skis and boots were provided for the 153 children; only one "qualified" ski instructor was provided, who because of the equipment shortage spent all of Saturday morning fitting the children with such skis and boots as were available; the other "instructors" were high school and college students whose agreements with defendants provided for only a few hours of instruction per day; one of the buses broke down on a country road en route to Great Barrington, stranding 40 children and two chaperones in the middle of the night; another bus had faulty brakes and only one headlight and was ticketed by the Massachusetts police; another bus en route back to New York poured exhaust fumes into its interior; one of the bus drivers was intoxicated and therefore unable to drive his bus on the return trip to New York; neither the buses nor the Club were licensed or certified by the Interstate Commerce Commission; and one busload of children was required to pay an unrefunded total of $71.75 for an extra meal in Great Barrington due to unsafe bus transportation.

■ In seeking redress of this apparently misfortune-strewn ski weekend brought about by the Club's misrepresentations, appellants have sought to invoke the jurisdiction of a federal court, rather than turning to traditionally available state court forums and remedies and have appended their state common law claims by way of invoking the doctrine of pendent jurisdiction. Seemingly unable to bring themselves within other federal statutes specially conferring federal court jurisdiction, and additionally unable to meet the minimum monetary requirements of 28 U.S.C. § 1331 or 28 U.S.C. § 1332, appellants imaginatively have brought this action pursuant to §§ 39 [4] and 43(a) of the Lanham Act.

The issue of consumer standing to sue under § 43(a) is one of first impression for this and apparently any federal court. In concluding that it lacked jurisdiction, the district court below relied on Marshall v. Proctor & Gamble Mfg. Co.,[5] which in turn relied without discussion on this court's *per curiam* opinion in the first reported § 43(a) case, Carpenter v. Erie R. Co.[6] Because both these cases are clearly distinguishable from the issue at bar,[7] and therefore not conclusive authority for the district

4. 15 U.S.C. § 1121.
   Section 39 provides as follows:
   "The district and territorial courts of the United States shall have original jurisdiction and the courts of appeal of the United States shall have appellate jurisdiction, of all actions arising under this chapter, without regard to the amount in controversy or to diversity of citizenship of the parties."

5. 170 F.Supp. 828 (D.Md.1959).
   In *Marshall*, the district court concluded without discussion but in very clear language that in an action under § 43(a) "a member of the public, as such, has no right of action under this section for personal injuries based upon alleged misrepresentation," that "the very broad language of Section 1125(a) [referring to § 43(a)'s use of "any person * * *"] cannot be taken literally" and that "the injury, to be actionable under the statute, must be one which occurs in the area of commercial relations [though]

the plaintiff * * * need not be a direct competitor of the defendant." 170 F.Supp. at 836 n. 8.

6. 178 F.2d 921 (2d Cir. 1949), cert. denied, 339 U.S. 939, 70 S.Ct. 672, 94 L.Ed. 1356 (1950).

7. *Marshall* is distinguishable because the court grounded its dismissal on the inability of the plaintiff, suing in his capacity as an inventor, to show the required commercial injury. *Carpenter* is distinguishable on several grounds. First there were a number of grounds for decision of which lack of standing under § 43(a) was one ("[T]hat section is applicable to no such circumstances as those alleged in support of his claim"), but a totally unnecessary one. The statute of limitations on Carpenter's previous claims had run some ten years before the Lanham Act was enacted, and he was "precluded from recovery in the present suit under the rule of *res judicata*." 178 F.2d at 922. Finally, Car-

court's position, we find it necessary to explore in detail whether there is any basis for appellants' standing to sue under §§ 39 and 43(a).

## SECTION 43(a) AND "PLAIN MEANING"

Appellants' principal contention is that the language of § 43(a), specifically the term "any person," is so unambiguous as to admit of no other construction than that of permitting consumers the right to sue under its aegis. On the face of the complaint all the prerequisites of § 43(a) seem to be met: (1) defendants are persons (2) who used false descriptions and misrepresentations (3) in connection with goods and services, (4) which defendants caused to enter commerce; (5) appellants are also persons (6) who believe themselves to have been in fact damaged by defendants' misdescriptions and misrepresentations.

Viewing the terms of § 43(a) in isolation there do not appear to be any vague words or inconsistent phrases which might permit any other inference than that which appellants would have us draw—i. e., that "any person" means exactly what it says.[8] It is further suggested that if Congress had desired, it could and would have limited or narrowed the class of protected plaintiffs to commercial parties merely by saying so. We reject this line of maxims of statutory construction in favor of Judge Learned Hand's more practical instruction that "[w]ords are not pebbles in alien juxtaposition,"[9] and therefore turn first to § 43(a)'s legislative history.

## LEGISLATIVE HISTORY

We agree with appellants that "[t]he Lanham Act of 1946 has a very long and convoluted legislative history,"[10] which

---

penter, suing for "misrepresentation of services" in his capacity as an injured former employee of the Erie Railroad, seems to have been a rather litigious person; by the time he raised the § 43(a) claim, the court had grown somewhat impatient with Carpenter's reassertion of previously barred claims, which the court said "can never justify a recovery." *Id.*

8. We note that the key language in § 43(a) is not "any person" but "any person who believes that he is or is likely to be damaged by the use of any such false description or representation." The proper focus therefore is whether appellants' claims partake of the *nature of the injury* sought to be prevented and/or remedied by Congress through § 43(a).

9. NLRB v. Federbush Co., Inc., 121 F.2d 954, 957 (2d Cir. 1941).

10. Br. at 16.
For bills containing versions of the measure ultimately enacted, see H.R. 8637, 68th Cong., 1st Sess.; S. 2679, 68th Cong., 2d Sess.; H.R. 6348, 69th Cong., 1st Sess.; S. 4811, 69th Cong., 2d Sess.; H.R. 13486, 69th Cong., 2d Sess.; H.R. 6683, 70th Cong., 1st Sess.; H.R. 11988, 70th Cong., 1st Sess.; H.R. 2828, 71st Cong., 2d Sess.; H.R. 9041, 75th Cong., 3rd Sess.; H.R. 4744, 76th Cong., 1st Sess.; H.R. 6618, 76th Cong.,

1st Sess.; H.R. 102, 77th Cong., 1st Sess.; H.R. 5461, 77th Cong., 1st Sess.; S. 895, 77th Cong., 1st Sess.; H.R. 82, 78th Cong., 2d Sess.; H.R. 1654, 79th Cong., 2d Sess.

Congressional hearings on a trademark bill were held on 14 occasions. See Joint Hearings Before the Committees on Patents, 68th Cong., 2d Sess. (1925); Hearings Before the House Committee on Patents, 69th Cong., 1st Sess. (1926); *id.*, 69th Cong., 2d Sess. (1927); Hearings Before the Senate Committee on Patents, 69th Cong., 2d Sess. (1927); Hearings Before the House Committee on Patents, 70th Cong., 1st Sess. (1928); *id.*, 71st Cong., 2d Sess. (1930); *id.* 72d Cong., 1st Sess. (1932); *id.* 75th Cong., 3rd Sess. (1938); *id.* 76th Cong., 1st Sess. (March 1939); *id.* 76th Cong., 1st Sess. (June 1939); *id.* 77th Cong., 1st Sess. (1941); Hearings Before the Senate Committee on Patents, 77th Cong., 2d Sess. (1942); Hearings Before the House Committee on Patents, 78th Cong., 1st Sess. (1943); Hearings Before the Senate Committee on Patents, 78th Cong., 2d Sess. (1944).

The various versions of the trademark bill were discussed in nine committee reports. See H.R.Rep. 944, 76th Cong., 1st Sess. (1939); S.Rep. 1562, 76th Cong., 3rd Sess. (1940); S.Rep. 568, 77th Cong., 1st Sess. (1941); H.R.Rep.

with respect to § 43(a) we find to be inconclusive and therefore of little or no help in resolving the issue decided today. We are cited by counsel to certain statements, actions and inactions and are asked to make certain causal connections among them and then to draw a set of preferred inferences therefrom. Counsel lay stress, for example, on the following statement made before a joint congressional committee in 1925 by a representative of the U. S. Trademark Association with respect to the language of a bill's provision, which, in substantially modified form, became § 43(a):

"It provides that any person who is damaged by the false description may start the suit. Obviously the purchaser might claim that he has been misled and damaged and start suit. At any rate, if it is intended to limit the right to start such a suit, that limitation should be stated."[11]

None of the committee members or draftsmen of § 30 of the 1925 bill expressed any disagreement with this statement, and the provision remained unchanged, containing no express limitation barring consumer suits.

We are asked to conclude from this ancient history that the committee's silence, followed by its inaction with respect to amending this portion of the bill, must mean that Congress clearly intended to create standing for consumers under the 1946 Act. On this flimsy record, it would be self-serving for us to invoke the doctrine of "silence as acceptance" as a basis upon which to draw any consequential inference with respect to § 43(a)'s legislative history.[12] We believe it more likely that the committee members evidenced no disagreement or agreement with the interpretation given § 30 by the above-quoted statement because neither was necessary; the committee members probably were sufficiently confident of their own interpretation that they felt that no clarification by way of reply and/or amendment was needed to implement their intention to confer standing solely upon commercial plaintiffs.

It is also suggested that since the statutory predecessor of § 43(a), § 3 of the Trademark Act of 1920,[13] was addressed solely to the prohibition of false designations of origin and authorized suit only by persons, corporations, etc., "*doing business* in the locality falsely indicated as that of origin [emphasis supplied]," [14] and since this type of language was preserved in several early

2283, 77th Cong., 2d Sess. (1942); H.R. Rep. 603, 78th Cong., 1st Sess. (1943); S.Rep. 1303, 78th Cong., 2d Sess. (1944); H.R.Rep. 219, 79th Cong., 1st Sess. (1945); S.Rep. 1333, 79th Cong., 2d Sess. (1946); Conf.Rep. 2322, 79th Cong., 2d Sess. (1946), for which see 92 Cong.Rec. 7522.

11. Joint Hearings Before the Committee on Patents, 68th Cong., 2d Sess. 127–128 (1925) (statement of Arthur W. Barber).

12. Compare Chicago, M., St. P. & P. R. Co. v. Acme Fast Freight, Inc., 336 U.S. 465, 474–475, 69 S.Ct. 692, 93 L.Ed. 817 (1949), in which the Supreme Court gave substantial weight to the unchallenged and uncontradicted statement of a ranking minority congressional committee member who "spoke in behalf of the bill [of which he was a principal draftsman and supporter] and presented the

only extended exposition of its provisions" on the floor of the House in clear contradiction of the committee's report.

13. 41 Stat. 534, 104, § 3.

14. This provision, although relevant for purposes of this discussion was in fact deemed to be a "dead letter," due principally to the requirement of proof of wilfulness or intent to deceive, a defect corrected by successor draft bills and ultimately by § 43(a). See Parkway Baking Co. v. Freihofer Baking Co., 255 F.2d 641, 648 n. 7 (3d Cir. 1958); California Apparel Creators v. Weider of California, 162 F.2d 893 (2d Cir.), cert. denied, 332 U.S. 816, 68 S.Ct. 156, 92 L.Ed. 393 (1947); see also Derenberg, Federal Unfair Competition Law, at the End of the First Decade of the Lanham Act: Prologue or Epilogue, 32 N.Y.U.L. Rev. 1029, 1035 (1957) (hereinafter Derenberg).

drafts of what became § 43(a) [15] but was ultimately dropped by the A.B.A. Trade-Mark Committee in favor of a provision permitting suit by "any person, firm or corporation who is or is likely to be damaged by the use of any false description or representation," [16] we should conclude that the A.B.A. rejection of the earlier colorably restrictive language and the congressional acceptance of the colorably broader A.B.A. language "clearly indicates an intent [attributable to Congress] [17] not to restrict the provision to actions by businessmen and tradesmen," and "a [congressional] concern to expand the class and type of person authorized to sue." [18] We, on the other hand, construe the deletion of the phrase "in his trade or business" from the earlier A.B.A. drafts to be equally consistent with a clearly expressed congressional purpose [19] to create a federal statutory tort of unfair competition *sui generis*,[20] thus rendering the subject phrase to the status of mere surplusage.

## PURPOSE OF § 43(a) AND PUBLIC POLICY

Appellants urge that under the test of Association of Data Processing Serv. Org. v. Camp,[21] they as consumers have standing under the Lanham Act because they have demonstrated injury in fact and that they come within a group "arguably within the zone of interests to be protected" [22] by the Act. Although the scope and effects of *Data Processing* have not yet been clearly delimited,[23] we hold that that case does not bring these appellants under its protective wing.

■ The congressional statement of purpose of the Act [24] is contained in § 45,[25] which in pertinent part states: "The intent of this chapter * * * is to protect persons engaged in such commerce against unfair competition." In this, the only phrase referring to the class of persons to be protected by the Act, as defined by their conduct and the source of the injuries sought to be protected against, no mention at all is made of the "public" or of "consumers." The legislative history of the Act, such as it is, adds nothing. We do know to a reasonable certainty, however, that the consumer protection explosion and the wholesale displacement (though not preemption) of traditional state statutory and common law remedies—matters pregnant with manifold consequences of great importance—were never considered or foreseen by Congress prior to

15. For example, an initial draft submitted by Mr. Edward S. Rogers to the A.B.A. Trade-Mark Committee authorized suit by "any person * * * who is or is likely to be *damaged in his trade or business* by any false description * * * [emphasis supplied]" Misc. Bar. Ass'n Reps., v. 22, item 26, § 27, Ass'n of the Bar of N.Y. catal. no. BA Misc. 681, v. 22.

16. *Id.*, item 27, § 27 (Rogers Preliminary Draft with Revisions) item 28, § 27 (Committee Preliminary Draft, Second Revision); item 25, § 30 (Committee final draft); item 29, § 30 (Version approved by A.B.A. House of Delegates).

17. Cf. Shapiro v. United States, 335 U.S. 1, 12 n. 13, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948).

18. Br. at 21.

19. *See* 15 U.S.C. § 1127, to be discussed *infra*.

20. Gold Seal Co. v. Weeks, 129 F.Supp. 928, 940 (D.D.C.1955), aff'd sub nom. S. C. Johnson & Son, Inc. v. Gold Seal Co., 97 U.S.App.D.C. 282, 230 F.2d 832 (D.C.Cir.), cert. denied 352 U.S. 829, 77 S. Ct. 41, 1 L.Ed.2d 50 (1956); see also Maternally Yours v. Your Maternity Shop, 234 F.2d 538 (2d Cir. 1956) (concurring opinion of Chief Judge Clark).

21. 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

22. 397 U.S. at 153, 90 S.Ct. at 830.

23. *See* Jaffe, Comment, Standing Again, 84 Harv.L.Rev. 633, 634 (1971).

24. See Coosaw Mining Co. v. South Carolina, 144 U.S. 550, 563, 12 S.Ct. 689, 36 L.Ed. 537 (1892).

25. 15 U.S.C. § 1127.

the enactment of § 43(a). We conclude, therefore, that Congress' purpose in enacting § 43(a) was to create a special and limited unfair competition remedy, virtually without regard for the interests of consumers generally[26] and almost certainly without any consideration of consumer rights of action in particular. The Act's purpose, as defined in § 45, is exclusively to protect the interests of a purely commercial class against unscrupulous commercial conduct.[27]

This view is supported by the leading case of L'Aiglon Apparel v. Lana Lobell, Inc.,[28] which, while expanding the statutorily protected class by giving an expansionary reading to the substantive content of § 43(a), still limited the protected class to commercial, though not necessarily competitive,[29] plaintiffs.[30] Although admittedly the *L'Aiglon* court was not presented with the question of consumer standing under § 43(a), we deem the court's opinion in context to set the outer limits of the class of § 43(a) plaintiffs contemplated by Congress. As the court noted, although § 43(a) was intended to create a federal unfair competition count, since "the Lanham Act was not intended to bring all unfair competition in commerce within federal jurisdiction,"[31] it was intended to be a special, limited one covering only those cases in which false description and/or false designation of origin

---

26. See Standard Brands, Inc. v. Smidler, 151 F.2d 34, 37–43 (2d Cir. 1945) (concurring opinion of Judge Frank) for a learned discussion of the historical-legal relationship between protection of commercial interests and consumer interests under the rubric of unfair competition, which relationship comprises the background against which Congress enacted § 43(a).

27. The court in Gold Seal Co. v. Weeks, 129 F.Supp. 928, 940 (D.D.C.1955), succinctly stated the import of § 43(a):

"It means that wrongful. diversion of trade resulting from false description of one's products invades that interest which an honest competitor has in fair business dealings—an interest which the courts should and will protect * * * It represents, within this area, an affirmative code of business ethics whose standards may be maintained by anyone who is or may be damaged by this segment of the code. In effect it says: you may not conduct your business in a way that unnecessarily or unfairly interferes with and injures that of another; you may not destroy the basis of genuine competition by destroying the buyer's opportunity to judge fairly between rival commodities by introducing such factors as false descriptive trademarks which are capable of misinforming as to the true qualities of the competitive products."

Although the language of the *Gold Seal* court would seem to permit the interpretation suggested by appellants, it seems very clearly the other way when read in the light of Judge Frank's concurring opinion in *Smidler*.

28. 214 F.2d 649, 651 (3d Cir. 1954).

29. Gold Seal Co. v. Weeks, 129 F.Supp. 928 (D.D.C.1955), aff'd sub nom. S. C. Johnson & Son, Inc. v. Gold Seal Co., 97 U.S.App.D.C. 282, 230 F.2d 832 (D.C.Cir.), cert. denied, 352 U.C. 829, 77 S.Ct. 41, 1 L.Ed.2d 50 (1956); Yameta Co. v. Capitol Records, Inc., 279 F.Supp. 582, 586 (S.D.N.Y.1968).

30. Appellants also rely on the famous passage in Chief Judge Clark's concurring opinion in Maternally Yours v. Your Maternity Shop, 234 F.2d 538, 546 (2d Cir. 1956), that "the bar has not yet realized the potential impact of this statutory provision." We construe that statement in context to refer to the federal courts' reluctance at that time to broaden the substantive scope of § 43 (a), as that section represented in Chief Judge Clark's view an opportunity and an invitation to create a federal law of unfair competition, which embraces far more than mere "passing off," the unduly narrow application of the provision prevalent at that time. *See* 234 F.2d at 546–547.

31. 214 F.2d at 654.

The *Lanham Act* originally included a specific section which read: "All acts of unfair competition in commerce are declared unlawful." This language was later dropped because it was regarded as "dangerously broad." Derenberg at 1063. This court has rejected the view that the Lanham Act, through § 44(i), 15 U.S.C. § 1126(i), creates independent

are alleged.[32] Since Congress deliberately excluded from coverage virtually all categories of unfair competition but for false advertising, it could not have intended to create a whole new body of substantive law completely outside the substantive scope of unfair competition. Yet this is what appellants would have us find, under the guise of granting them standing, for the question of consumer standing and that of the creation of wholly new federal common law of consumer protection under § 43(a) cannot be disentwined.[33]

Moreover, consumers' use of § 39 of the Act, which requires the allegation of neither a minimum monetary amount in controversy nor diverse citizenship, in combination with the expansive jurisdictional delineation given the phrase "in commerce," [34] and the procedural advantages of bringing suit in federal court,

would lead to a veritable flood of claims brought in already overtaxed federal district courts, while adequate private remedies for consumer protection, which to date have been left almost exclusively to the States, are readily at . hand. Great strides are now being made in this area to expand the already numerous remedies available in state courts,[35] and this court has no desire to interfere with that process by an unprecedented interpretation of longstanding federal law.[36]

One of appellants' arguments favoring a literal interpretation of "any person" is that "[h]ad Congress desired to limit actions under section 43(a) to those brought by competitors or by commercial concerns generally, it could and would have so provided." Our analysis requires that the manner in which this issue be posed is precisely the reverse:

federal jurisdiction over the entire field of unfair competition. See American Auto. Ass'n v. Spiegel, 205 F.2d 771, 774 (2d Cir.), cert. denied, 346 U.S. 887, 74 S.Ct. 138, 98 L.Ed. 391 (1953); *approved*, Derenberg at 1061; compare Stauffer v. Exley, 184 F.2d 962 (9th Cir. 1950).

**32.** Chief Judge Hastie stated, "This statutory tort bears closest resemblance · to the * * * tort of false advertising to the detriment of a competitor, as formulated by the ALI * * *," which tort makes clear that consumers must rely on other sections. Section 761 of the Restatement of Torts in pertinent part provides as follows:
"*One who diverts trade from a competitor* by fraudulently representing that the goods which he markets have ingredients which in fact they do not have but which the goods of the competitor do have, *is liable to the competitor* * * *" [emphasis supplied].

**33.** See Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957) (dissenting opinion of Mr. Justice Frankfurter).

**34.** See Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964) and its progeny.

**35.** State authorities have been far from lethargic in responding to the current consumer protection explosion. See, e. g., the Revised Uniform Deceptive Prac- .

tices Act in Handbook of the National Conference of Commissioners on Uniform State Laws 306–315 (1966), which was initially approved by the Commissioners on Uniform State Laws and by the A.B.A. House of Delegates in 1964, and which has been adopted by eight states (Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, New Mexico and Oklahoma). Section 3(a) of the Uniform Act has been construed unofficially to confer standing on defrauded consumers seeking injunctive relief (no money damages are provided) although the Uniform Act "originated as an effort to reform the law of business torts, not consumer torts." See Dole, Consumer Class Actions Under the Uniform Deceptive Practices Act, 1968 Duke L.J. 1101, 1107, 1109. Mr. Dole was a consultant to the Special Committee on Unfair Competition of the National Conference of Commissioners on Uniform States Laws from 1962 to 1965. *See also* the recently amended Massachusetts "Regulation of Business and Consumer Protection Act," Mass. Acts, ch. 690, ch. 814 (1969), amending Mass.Ann.L. ch. 93A, §§ 1–8 (Supp.1968); Goodman, An Act to Prohibit Unfair and Deceptive Trade Practices, 7 Harv.J.Legis. 122, 146–153 (1969).

**36.** Cf. Phillips v. Rockefeller, 435 F.2d 976, 980 (2d Cir. 1970) (construction of the Seventeenth Amendment).

had Congress contemplated so revolutionary a departure implicit in appellants' claims, its intention could and would have been clearly expressed.[37]

Affirmed.

---

**37.** Cf. Herpich v. Wallace, 430 F.2d 792, 809 (5th Cir. 1970) (scope of § 10(b) of the Securities Exchange Act of 1934); 2 L. Loss, Securities Regulation 902–903 (2d ed. 1961) (scope of SEC power under § 14 of the Securities Exchange Act of 1934).

Although we hold that consumers have no right of action under § 43(a), we note that the federal government through the Federal Trade Commission has intervened in the marketplace and in the courts to vindicate the rights of the consuming public. Chief Judge Clark in his concurring opinion in the *California Apparel* case stated:

"So far as the consumer is concerned, he is not dependent upon the private remedial actions brought by competitors for the remedies under the Federal Trade Commission Act * * * are now extensive * * *"

162 F.2d 896; *accord*, 1 R. Callman, Unfair Competition, Trademarks and Monopolies § 18.2(b), at 626 (3d ed. 1967). That Chief Judge Clark's faith in the FTC perhaps has proved excessive, *see e. g.*, A.B.A. Committee to Study the Federal Trade Commission Report (1969); E. Cox, R. Fellmeth & J. Schultz, The Nader Report on the Federal Trade Commission (1969); Baum, The Consumer and the Federal Trade Commission, 44 J.Urb.L. 71 (1966), does not derogate from our conclusion that commercial and consuming classes intentionally have been provided separate remedies.